AMALGAMATED MEAT CUTTERS &
BUTCHER WORKMEN OF NORTH
AMERICA, LOCAL 195, AFL–CIO,
Appellant,

v.

CROSS BROTHERS MEAT
PACKERS, INC.

No. 74–1436.

United States Court of Appeals,
Third Circuit.

Argued Jan. 20, 1975.

Decided June 10, 1975.

Robert D. Kaplan, Casper & Muller, Howard J. Casper, Mark P. Muller and Charles G. Nistico, Philadelphia, Pa., for appellant.

Leonard J. Bucki, Robert E. Wachs, David F. Girard-DiCarlo, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellee.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal from a March 22, 1974, district court judgment. The court enforced the award of an arbitrator in favor of the defendant-counter-claimant, Cross Brothers Meat Packers, Inc. ("Packers"), and against the plaintiff, Local 195 of the Amalgamated Meat Cutters and Butcher Workmen of North America AFL–CIO ("Local 195," the "local," or "the union"). *Amalgamated Meat Cutters Local 195 v. Cross Bros.*

*Meat Packers, Inc.,* 372 F.Supp. 1274 (E.D.Pa.1974).

Local 195 is the elected bargaining representative of two collective bargaining units within the Packers plant, the two units consisting of slaughtering employees and boning employees. There are two other collective bargaining units in Packers, consisting of office and clerical employees and of delivery employees. These units are represented by Teamsters' Locals 161 and 500, respectively. Local 195 also represents a bargaining unit in a second company, Cross Brothers Hotel Supply, Inc. ("Supply"). Packers and Supply are located across the street from one another. While not contesting the issue, Packers has reserved its position on Local 195's position that Packers and Supply are in reality a single employer, contending that this issue has no legal significance. See 372 F.Supp. at 1277; *Cross Bros. Meat Packers, Inc. and Amalgamated Meat Cutters, Local 195,* Voluntary Labor Arbitration Tribunal, Case No. 14 30 085 71 R, Arbitrator's October 7, 1972, Award and Opinion (Stein, Arbitrator) at 3 (hereinafter "Arbitrator's Opinion").

The incident underlying this litigation occurred on July 1, 1971, the first day after the Supply unit's collective bargaining agreement had expired.[1] On that day the Supply employees struck Supply and 20 to 30 Supply employees also began to picket across the street at the four entrances to Packers' premises. 372 F.Supp. at 1277. Local 195 requested employees of Packers to respect the picket line. *Id.* The arbitrator described the success of the picket line as follows:

"On July 1, 1971, Packers expected approximately 65 slaughterhouse and 18 boning employees to report for work. None reported, since they refused to cross the Local 195 picket line. The office and clerical employees and the delivery employees, represented by Teamsters' locals 161 and 500 respectively, similarly did not report for work. . . . Employees of an independent contractor building an addition to Packers' building, as well as those of a garbage removal contractor, also refused to cross the picket line in order to perform their job duties. . . . Packers' employees who were not part of any represented bargaining unit, including members of management, were either not permitted to enter the building or were induced not to report for work."

Arbitrator's Opinion at 5. The shutdown at Packers did not last long; in the afternoon of July 1, 1971, a Pennsylvania Court of Common Pleas issued a "preliminary restraining order" which prevented Local 195 from picketing at the Packers plant. *Cross Bros. Meat Packers, Inc. v. Amalgamated Meat Cutters Local 195, et al.,* Court of Common Pleas, County of Philadelphia, June Term 1971, No. 4535.

At the time of the work stoppage there were collective bargaining agreements in effect for the two units of Packers employees represented by Local 195. Both agreements contained "no-strike" clauses, in each of which the union guaranteed "for itself and for its individual members" that there would be no interference with production during the term of the agreement.[1a] Both agreements also created grievance procedures which included compulsory arbitration as the last resort.[2]

---

1. The agreement was negotiated by a hotel and restaurant supply association, of which Supply was a member, and Local 195. Arbitrator's Opinion at 4.

1a. The dissenting opinion underestimates, we believe, this guarantee language in the two Packers' contracts with Local 195 and ignores the fact that Local 195, not the Supply employees, is the defendant on the counterclaim.

2. Article Tenth of the agreement for the slaughtering unit provided:
"TENTH: STRIKES, LOCK–OUTS, GRIEVANCES AND ARBITRATION
"The Union, for itself and for its individual members, agrees and guarantees that there shall be no strike, stoppage of work, slowdown or other interference with production. The Employer agrees that he shall not lock out his employees during the term of this

Invoking these grievance procedures, Packers demanded compensation from Local 195 for the damages caused by the work stoppage. Voluntary adjustment of the claims failed, and the matter was submitted to a single arbitrator.[3] On October 7, 1972, the arbitrator ordered the union to pay Packers $14,826.43 in damages.[4] On November 9, 1972, Local 195 filed a complaint in the United States District Court for the Eastern District of Pennsylvania, requesting the court to vacate the arbitrator's award.[5] Packers counterclaimed for enforcement

agreement. The Union further agrees not to call a sympathy strike for any reason whatsoever during the term of this agreement.

"Should any difference arise between the parties hereto or between the Employer and the employees as to the interpretation or application of this agreement, an earnest effort shall be made to settle such difference in the following manner:

"(a) The grievance shall be in the first instance taken up by the steward with a designated representative of management at a time and place mutually agreeable. If no adjustment is reached:

"(b) The grievance shall be referred to the appropriate Union official for presentation to the appropriate official of the Employer and shall be answered by the Employer within two weeks after such referral. If no adjustment is thus reached:

"(c) The grievance shall be submitted to an arbitration board by either party, and the arrangements for the arbitration procedure, including the selection of the third arbitrator, shall be completed within thirty (30) days from the date of the final answer of the Employer. The board of arbitration shall be composed of three members, one selected by the Employer, one selected by the Union, and the third member selected by the first two. If a third arbitrator agreeable to both parties cannot be selected, the parties agree to draw a third arbitrator by lot from names submitted by the American Arbitration Association. The board of arbitration shall have no right to modify, amend or add to the terms of this agreement, or to require of the Employer, the Union or of any employee of the Employer, any act it or he is not required by law or by this agreement to perform. Each party shall share equally the expenses of the third member of the arbitration board. Any decision of the board of arbitration within the scope of its authority shall be final and binding upon both parties during the term of this agreement.

"The Employer shall have the right to initiate and process grievances in the same manner as above provided."

Document No. 2, Exhibit A, pp. 7–9. Article IX of the agreement for the boning unit provided:

### "ARTICLE IX

"Strikes, Lockouts, Grievances and Arbitration

"Section 1. The UNION for itself and for its individual members agrees and guarantees that there shall be no strike, stoppage of work, slow-down or other interference with production. The EMPLOYER agrees that he shall not lock out EMPLOYEES during the term of this Agreement. The UNION further agrees not to call a sympathy strike for any reason whatsoever during the term of this agreement.

"Section 2. If a grievance arises, it shall be taken up immediately in the first instance with the foreman or other supervisor of the EMPLOYER by the steward. The foreman or supervisor shall render his decision thereon as soon as possible. If no adjustment is thus reached, then the parties hereto agree that any matter in controversy or dispute shall be referred immediately to two (2) representatives, one to be appointed by the UNION and the other by the EMPLOYER for adjustment, and if the two cannot agree, they shall select an Impartial Chairman to whom the matter shall be submitted. The findings and decisions of the Impartial Chairman shall be final and binding upon the parties hereto."

Document No. 1, Exhibit A, pp. 8–9. The latter provision was negotiated by Local 195 and The Boneless Meat Dealers of Philadelphia and Vicinity, of which Packers was not a member, but Packers and Local 195 independently agreed to its terms. Arbitrator's Opinion at 4.

3. The parties dispute whether this submission was in compliance with the collective bargaining agreements. See Section II of this opinion, pages 1120–1121.

4. These damages consisted of $1100. for feed and transportation for three truckloads of cattle which were denied ingress to the plant; $8405. for shrinkage caused by delay in slaughtering cattle and in shipping processed meat; $600. for condemnation of 2000 lbs. of meat; and $4721.43 for counsel fees. Arbitrator's Opinion at 5–6, 11–12.

5. The district courts have jurisdiction under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185 (1963), to enforce arbitration awards made pursuant to such contracts. Local 336, American Fed'n of Musicians v. Bonatz, 475 F.2d 433 (3d Cir. 1973). Conversely, the district court had jurisdiction over Local 195's suit to set aside the arbitrator's award.

of the arbitration award. In an initial Memorandum Opinion, the district court denied Packers' motion for judgment on the pleadings. *Amalgamated Meat Cutters Local 195 v. Cross Bros. Meat Packers, Inc.,* 362 F.Supp. 127 (E.D.Pa.1973). In a second opinion, the court granted the defendant's motion for summary judgment. *Amalgamated Meat Cutters Local 195 v. Cross Bros. Meat Packers, Inc.,* 372 F.Supp. 1274 (E.D.Pa.1974). Local 195 timely appealed from the district court's judgment in favor of Packers.

## I.

The first issue raised by Local 195 is whether Packers' claim for damages caused by the picketing was arbitrable.[6] Both parties agree that this issue is for the courts to decide. *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 546–47, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *Local 616, Int. U. of E., R. & M. Wkrs. v. Byrd Plastics, Inc.,* 428 F.2d 23, 25 (3d Cir. 1970).

It is helpful to divide the dispute into two parts, damages caused by the refusal of members of the boning and slaughtering units to cross the Supply unit's picket line, and damages caused by the refusal of other persons to cross the picket line.

▮▮ With respect to the first, we can begin with two generally accepted propositions: the union can bargain away the right of members of a collective bargaining unit it represents to honor lawful picket lines; and, therefore, the question whether that right has been bargained away may be an arbitrable question. *NLRB v. Rockaway News Supply Co.,* 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953); *Island Creek Coal Co.*

*v. United Mine Workers,* 507 F.2d 650 at 652–653 (3d Cir. 1975). Both the slaughtering and the boning agreements included grievance-arbitration clauses which were called into play "[s]hould any difference arise between the parties hereto . . . as to the interpretation or application of this agreement," and "[i]f a grievance arises."[7] While these clauses did not specifically refer to disputes over the right of the employees to honor lawful picket lines, they were contained in the same articles that contained sweeping no-strike clauses. It is, therefore, natural to infer that the scope of the no-strike clauses was a proper subject of arbitration, particularly in the light of the strong policy favoring the peaceful resolution of labor disputes through arbitration. See *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs Local 926,* 502 F.2d 321, 323 (3d Cir.), *cert. denied,* 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974). Since this court recently held that the question whether the union had relinquished the right to cross picket lines was arbitrable, even in the absence of any no-strike provision, *Island Creek Coal Co. v. United Mine Workers, supra,* it would be anomalous to reach a different result in this case, where both collective bargaining agreements contained strong no-strike clauses which were tied directly to the grievance-arbitration mechanism.

▮▮ The arbitrator's award extended beyond the damages caused by the actions of the slaughtering and boning employees, however. His award also encompassed the damages caused by the refusal of persons not represented by Local 195 to cross the Supply picket lines.[8] Apparently, the arbitrator included these damages because he found that

---

6. Packers contends that this issue was not presented to the district court. Appellee's Brief at 9. We agree with Local 195 that it argued the issue before the district court. See Memorandum of Law in Support of Plaintiff's Motion, App. 183a–84a.

7. See note 2 above.

8. See note 4 above.

the picketing itself—apart from the actions of the slaughtering and boning employees in honoring the picket lines—was proscribed by the collective bargaining agreements covering the slaughtering and boning units.[9] Arbitrator's Opinion at 9–11. We therefore must decide whether the Supply employees' right to picket was an arbitrable issue where the collective bargaining agreement covering those employees had expired, but where the local which represented them had agreements which related to different bargaining units, and which contained no-strike and arbitration clauses.[10]

Our problem is that the two basic propositions with which we began analysis of the arbitrability of the first part of the arbitrator's award (page 1117, supra) cannot form the foundation for analysis of the second part. It is one thing to say that a union, in representing one collective bargaining unit, may bargain away that unit's right to honor picket lines, but quite a different thing to say that in representing one unit the union may bargain away the right of a different unit to picket at the first unit's work location. And yet this is exactly the result which the arbitrator reached. He interpreted collective bargaining agreements for the slaughtering and boning employees in such a way as to allow Packers to recover damages caused by the picketing of Supply employees, who were members of an entirely different collective bargaining unit, and whose collective bargaining agreement had expired.

■ So far as we have been able to determine, we face a question of first impression. Strong arguments have been advanced on both sides. The union bases its contentions on the unassailable proposition that an arbitrator's power derives from an existing collective bargaining agreement. *John Wiley & Sons, Inc. v. Livingston, supra,* 376 U.S. at 546–47, 84 S.Ct. 909; *Steelworkers v. Warrior & Gulf Co., supra,* 363 U.S. at 582, 80 S.Ct. 1347. Since the picketing related to a dispute between Local 195 and Supply, between whom there was no existing collective bargaining agreement, there was no contractual basis for the arbitrator's power to determine the union's right to picket. Put another way, the union is maintaining that it could not force Supply to arbitrate the economic dispute (negotiation of a new collective bargaining agreement) which gave rise to the picketing; therefore, there is no quid pro quo for the no-strike "agreement" which the arbitrator enforced against the union. See *Avco Co. v. Local 787, UAW,* 459 F.2d 968, 971–73

9. Whether Local 195's picketing at the Packers plant was lawful under the "ally doctrine," *NLRB v. Local 810, Steel Fabricators,* 460 F.2d 1 (2d Cir.), *cert. denied,* 409 U.S. 1041, 93 S.Ct. 527, 34 L.Ed.2d 491 (1972), is irrelevant to the issue of arbitrability. Even if the Supply unit's picketing of the Packers plant had been a glaring illegal secondary boycott, the question would remain whether damages resulting from the picketing may properly be claimed before an arbitrator whose power derives from collective bargaining agreements for different bargaining units.

10. Since courts may only enjoin protected, concerted activity if arbitration is available to the union as a quid pro quo, see *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Avco Co. v. Local 787, UAW,* 459 F.2d 968, 971–73 (3d Cir. 1972), a holding that Supply's picketing at the Packers plant was enjoinable under the slaughtering and boning agreements would necessarily imply that the issue of the union's right to picket there was arbitrable under those agreements. The question arises, therefore, whether the injunction against the picketing entered by the Court of Common Pleas for the County of Philadelphia, see page 1115 *supra,* does not collaterally estop Local 195 from litigating the issue of the picketing's arbitrability. We have concluded that it does not. An *ex parte* "preliminary restraining order" was entered on July 1, 1971. App. 45a. On July 20, 1971, the court held a hearing on the question whether a "preliminary injunction"' should not be issued. Local 195 was to submit a brief on the question within a week. Transcript of July 20, 1971, hearing before Cipriani, J., at 75 (App. 123a). On July 26, 1971, Packers' attorney submitted to the court an "Order to Settle, Discontinue, and End" the suit. Judge Cipriani entered such an order on July 29, 1971. It thus appears that no final disposition on the merits was ever made, so that the state court action has no collateral estoppel effect on the issue of arbitrability in this court.

(3d Cir. 1972); see also *The Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 252–53, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).[11]

■ Packers, on the other hand, points out that in both the slaughterhouse and boning agreements Local 195 guaranteed "for itself," without limiting "itself" to its capacity as representative for the slaughtering and boning units, that it would not engage in any work stoppage.[12] The company maintains that it had a right to rely on these clauses and that the local should not be allowed to circumvent them by "changing hats," first agreeing to broad no-strike clauses as the representative for two units, then picketing as the representative for a third unit. On the company's side is the strong presumption in favor of arbitration. See *United Mine Workers v. Warrior & Gulf, supra.*

■ Because courts should not dissect unitary arbitration awards, see *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123 (3d Cir. 1969), and for the reasons given at p. 1124 of the concurring opinion, the award should be enforced in its entirety or not at all. While we are not prepared to give a generalized answer, several factors in this case persuade us that Packers was entitled to arbitration of both parts of its claim.[13] Where a suggested interpretation of the scope of a collective bargaining agreement is not plainly frivolous, and the arbitration clause encompasses the "interpretation" of the agreement (see Article TENTH, second paragraph, at note 2 above), we believe that courts should leave it to the arbitrator to pass on the suggested interpretation. See A. Cox, Reflections upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1515–17 (1959), where this language appears at 1516:

> "[A]rbitration should be ordered in an action under section 301 whenever the claim might fairly be said to fall within the scope of the collective-bargaining agreement. If the latter contention be made but is patently frivolous, arbitration should be denied."

11. The union contends, further, that the arbitrator's result is anomalous because it turns on the fortuity that the same local represented both the Supply unit and the slaughtering and boning units; the arbitrator himself thought that the result might well have been different if the Supply unit had been represented by a different local. Arbitrator's Opinion at 11. However, the arbitrator's award is not as anomalous as the union believes. Restrictions on a union member's right to engage in protected, concerted activity frequently arise from his local's membership in a parent organization. The international may, for example, require the local to agree to compulsory arbitration in its collective bargaining agreements. The local may also be required to seek the international's approval before any strike. See 48 Am.Jur.2d, Labor and Labor Relations § 87 (1970). In such cases, restrictions on the member's protected activities flow from his local's membership in an international. In this case, the restriction on the Supply unit's right to picket flows from its membership in the same local which represents the Packers units. We can perceive no difference in principle, so long as the members of the Supply unit had some forewarning of the potential limitation on their protected activities, as members of an international are forewarned by the international's constitution and practices.

12. At least one of the picketers carried a placard indicating that "Local 195" was on strike. Arbitrator's Opinion at 4.

13. In so deciding, we do not prejudge the question whether the members of the Supply unit would have an action for unfair representation against Local 195. It is true that such suits have usually involved alleged discrimination between members of a single collective bargaining unit. See, e. g., *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967) ("A breach of the statutory duty of fair representation occurs only when a union's conduct *toward a member of the collective bargaining unit* is arbitrary, discriminatory, or in bad faith" (emphasis added).); *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964) (suit against union for unfairly favoring employees of one company over those of another when both groups were members of the same collective bargaining unit). However, the extension of the principle of unfair representation to alleged preference of one bargaining unit over another by the same local has never, as far as we have been able to determine, been passed upon by the courts. Contrary to the dissent, this note is not designed to make any implication.

Prior to July 1, 1971, strikes against Supply had never resulted in picketing at the Packers plant, and strikes against Packers had not resulted in picketing at the Supply plant. Arbitrator's Opinion at 11. Thus, Packers might legitimately have anticipated that there would be no work stoppage at its plant so long as the Packers collective bargaining agreements were in effect, even if there were a stoppage at Supply. Packers' reading of the collective bargaining agreements with Local 195 as codifications of their past bargaining history was a possible, and therefore an arbitrable, interpretation of the no-strike clauses in those agreements.[14]

In the second place, the union could have altered the expectations which arose from Packers' past experience. Drafting an exception to the no-strike clauses of the slaughtering and boning agreements for lawful picketing by Supply employees would have avoided arbitration of the Supply picketing by rendering Packers' interpretation of the agreements patently frivolous. Cf. Arbitrator's Opinion at 11.[15] Finally, holding for the company does not entirely deprive the members of the Supply unit of their right to engage in protected concerted activity. The arbitrator could have interpreted the agreements in favor of the union. Even though he did not, Local 195 was still free to strike Supply and to picket the Supply plant; the Supply employees were only penalized for picketing allegedly protected by the "ally doctrine."[16]

For all these reasons, which we emphasize are peculiar to the unique facts of this case, we have concluded that in negotiating the slaughtering and boning agreements Local 195 agreed to arbitrate the question of the Supply unit's right to picket at the Packers plant. The above considerations also persuade us that, in this case, the policy in favor of the peaceful resolution of labor disputes through arbitration outweighs any damage which arbitration might cause to the Supply unit's right to picket at the Packers plant. We will, therefore, enforce the arbitrator's damage award in its entirety.

We could well reach a different conclusion if the employer's stated expectations were based solely on ambiguous language in the collective bargaining agreement, rather than the language and past history, or if enforcing the arbitration agreements would entirely deprive the employees in the unit not covered by a collective bargaining agreement of their right to engage in concerted activity. In the circumstances of this case, however, we hold that Local 195's right to picket the Packers plant was an arbitrable issue under the slaughtering and boning agreements.

II.

The union next objects to the submission of Packers' claim to a single arbitrator. The nub of the problem is that the two collective bargaining agreements between Local 195 and Packers provided for different arbitration procedures. The agreement for the slaughtering employees contemplated arbitration by a panel of three arbitrators; under the boning agreement, the union and Packers were to select an "impartial chairman" when their representatives could not agree on the resolution of a dispute.[17] It is the union's position that

14. Because this is a suit to enforce an arbitrator's award, rather than a suit to compel arbitration, we already have the benefit of the arbitrator's opinion. He not only decided that Packers' interpretation of the agreements was not frivolous, but also agreed with that interpretation.

15. This course is still open to the union to avoid a repetition of the situation which caused this suit. The union could also bargain to have the three agreements expire at the same time, or to modify the no-strike clauses of the existing agreements. See Humphrey v. Moore, 375 U.S. 335, 353, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964) (Goldberg, J., concurring). Finally, the union could petition the NLRB for consolidation of the three bargaining units.

16. See note 10 above.

17. See note 2 above.

there was an outstanding factual issue regarding its waiver of a right to the three-member panel provided in the slaughtering agreement, so that the district court erred in entering summary judgment for Packers.

■ As Local 195 acknowledges, it was for the arbitrator to decide whether the procedural aspects of the arbitration clauses had been followed. *John Wiley & Sons v. Livingston, supra,* 376 U.S. at 557, 84 S.Ct. 909. The local appears to believe that there should be an exception to this rule where, as here, the arbitrator did not discuss the issue whether the local had waived its right to a panel of three under the slaughtering agreement.

■ We have found no support for such an exception. The arbitrator's silence could indicate that the union failed effectively to call the three-member panel issue to the arbitrator's attention. A party who voiced an ambiguous objection to the arbitrator's jurisdiction [18] at the beginning of arbitration should not be permitted to reopen the arbitrator's award in the courts on the ground of the arbitrator's understandable failure to discuss the issue of the panel's composition in his award.[19]

■ Alternatively, the silence might indicate that the arbitrator decided that the three-member panel issue did not merit independent discussion in his award. The Supreme Court has said that "[a]rbitrators have no obligation to the court to give their reasons for an award." *Steelworkers v. Enterprise Wheel Co.,* 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). As the district court noted, there were ample grounds on which the arbitrator could have based his decision to assume jurisdiction over the claim, despite the three-member provisions in the slaughtering agreement. 372 F.Supp. at 1276–77. That the arbitrator did not articulate these reasons should not open the union's objections to decision by a single arbitrator to second-guessing by the courts. *Steelworkers v. Enterprise Wheel, supra.* We therefore conclude that, even if there were factual issues outstanding regarding the union's waiver of a right to a panel of three arbitrators, these issues were for the arbitrator, not the courts, to decide.

## III.

■ The final argument made by Local 195 is that the arbitrator's award was "arbitrary, capricious, and in manifest disregard of the law." As the union's own statement of the issue suggests, our scope of review is narrow in the extreme. We must affirm if the award "can in any rational way be derived from the agreement," and can only reverse if "there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop." *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1128 (3d Cir. 1969). See *Steelworkers v. Enterprise Wheel, supra,* 363 U.S. at 599, 80 S.Ct. 1358. The union's arguments under this heading stem primarily from its contention that a collective bargaining agreement with respect to one collective bargaining unit could not, as a matter of labor policy, restrict the right of another unit to engage in protected, concerted activities. Thus, they address the question whether the issue of damages caused by the picketing was arbitrable,

---

**18.** Local 195 relies on an affidavit of one of its attorneys, Mark P. Muller. Doc. 12, Exhibit A. According to that affidavit, Mr. Muller "personally appeared at said arbitration and objected to the jurisdiction of the American Arbitration Association, and any arbitrator or arbitrators appointed to arbitrate this case, Professor Stein included." The affidavit also claimed that "[a]t no time during his representation of Local 195 in the present case did [Mr. Muller] ever agree, either explicitly or impliedly, to the arbitration process nor to Professor Stein as the single and sole arbitrator."

On our reading, Mr. Muller's objection was directed more clearly to the issue discussed under "I" of this opinion than to this three-member panel issue. *Cf.* 372 F.Supp. at 1276.

**19.** Similarly, a "loser is not permitted for the first time to raise an objection to the arbitration panel after the award has been made." 372 F.Supp. at 1276 n.2.

discussed under "I" above. We concluded that, at least in this case, the damages caused by the picketing were arbitrable.

■ The only question remaining is whether the arbitrator's award was in "manifest disregard" of the slaughtering and boning agreements. We have no difficulty in holding that it was not. In both agreements the union guaranteed "for itself" that there would be no work stoppage, which naturally suggests that the union would not picket the Packers plant during the terms of those agreements.[20] This reading of the agreements is consistent with the union's prior practice of not picketing Packers when striking Supply.[21] We therefore conclude that the arbitrator's award was properly derived from the collective bargaining agreements between Local 195 and Packers.

Accordingly, the judgment of the district court will be affirmed.

GIBBONS, Circuit Judge (concurring):

The district court granted summary judgment for the defendant Cross Brothers Meat Packers, Inc. (Cross) on its counterclaim seeking enforcement of an arbitration award, and denied the motion of the plaintiff Amalgamated Meat Cutters & Butcher Workmen of North America, Local 195, AFL–CIO (Local 195) for summary judgment vacating and setting aside that award. I vote to affirm because the dispute between Cross and Local 195 was arbitrable under the terms of the governing collective bargaining agreement, the arbitration was conducted in the manner agreed upon by the parties, and the award sufficiently draws its essence from the agreement.

Across the street from the Cross Brothers Meat Packers plant is the plant of Cross Brothers Hotel Supply, Inc. (Hotel Supply), a separate corporation which purchases meat for resale to the hotel and restaurant trade. Prior to June 30, 1971 Local 195 was the collective bargaining representative of employees in a bargaining unit in Hotel Supply. The Hotel Supply unit's collective bargaining agreement expired on June 30, 1971. At midnight on that date a picket line was established by supply employees at the Hotel Supply plant. On July 1, 1971 the Hotel Supply picketing line was extended to the Cross plant across the street. Members of Local 195 in the slaughtering and boning divisions of Cross refused to cross this picket line manned by Hotel Supply people. This work stoppage lasted one day. It came to an end when Cross sought and obtained in the Court of Common Pleas of Philadelphia County a preliminary restraining order directing Local 195 to cease picketing at the Cross plant.[1] The validity of that order is not an issue in this appeal since the dispute is over damages suffered by Cross prior to the time the work stoppage ended rather than over whether the injunction was proper.[2]

After the work stoppage ended Cross made a demand on Local 195 for damages. When Local 195 rejected this demand Cross filed a demand for arbitration pursuant to the arbitration clause quoted at note 2 in Judge Van Dusen's opinion, *supra*. A hearing was held before Arbitrator Emanuel Stein on May 31, 1972 and on October 7, 1972 he determined:

"It is my opinion, and I so hold, that the Union shall pay to the Company the sum of $14,826.43 in damages for the breach of its no-strike agreement

**20.** See note 2 above.

**21.** See pp. 1119–1120 above. Cf. *Newark Stereotypers' U. No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 600 (3d Cir. 1968).

**1.** *Cross Bros. Meat Packers, Inc. v. Amalgamated Meat Cutters Local 195 et al.*, Court of Common Pleas, County of Philadelphia, June Term 1971, No. 4535.

**2.** *Compare Island Creek Coal Co. v. United Mine Workers*, 507 F.2d 650 (3d Cir. 1975); *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, Parts and Garage Employees, Local 926*, 502 F.2d 321 (3d Cir.), *cert. denied*, 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974).

with Packers." Complaint, Exhibit B, Arbitrator's Opinion at 12.

On November 9, 1972 Local 195 filed a complaint pursuant to § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, in which it disputed the jurisdiction of Arbitrator Stein. The complaint also alleged that the award "is arbitrary and capricious and exceeds the arbitrator's authority under the Collective Bargaining Agreement," and so requested the court to vacate the award.

Cross filed an answer and a counterclaim for enforcement of the arbitration award, and then made a motion pursuant to Rule 12(c), Fed.R.Civ.P., for judgment on the pleadings. However, since Article X of the slaughtering division contract provided for an arbitrator's panel of three members, while, as the pleadings made clear, the award was made by a single arbitrator, the pleadings disclosed a factual dispute as to whether Local 195 waived the provision for three members and so the district court denied this motion.[3] The parties thereafter engaged in discovery. Upon its completion Cross moved pursuant to Rule 56 for summary judgment enforcing the award. From the order granting that motion Local 195 appeals. The union contends: (1) that the dispute was not arbitrable; (2) that there is a factual dispute as to its consent to proceed before a single arbitrator rather than three; and (3) that the arbitrator's decision was arbitrary and capricious. I concur in Judge Van Dusen's treatment of issue (2), but I reach the result he does on issues (1) and (3) by a somewhat different route.

## ARBITRABILITY

Local 195 urges that since the picket line was posted by employees of Hotel Supply at a time when its collective bargaining agreement expired, there was no contract arbitration provision under which the arbitrator could have jurisdiction. It claims that this same contention

was advanced to the arbitrator, and was rejected. By focusing attention upon the expired contract the local would have us disregard the two agreements which were still in force, both of which had broad no-work stoppage clauses and both of which provided for arbitration of disputes arising out of work stoppages. It was Cross' contention that there was a work stoppage in its plant which violated those agreements and that Local 195 was liable for damages resulting from the claimed violation. I conclude that Cross' claim that there was a work stoppage in breach of the agreements between it and Local 195 is clearly an arbitrable dispute within the meaning of those agreements. The fact that the Hotel Supply Contract had expired at the time of the picketing simply has no bearing upon the arbitrability of Cross' claim that a work stoppage took place in breach of the collective bargaining agreements then in effect. The refusal of the Cross employees to cross the Hotel Supply picket line arguably might fall outside either contract, but the contention that such refusal was a breach of contract was a "difference aris[ing] between the parties hereto or between the Employer and the employees as to the interpretation or application of this agreement," and hence a matter for arbitration.[4] I conclude that the arbitrator had contractual jurisdiction over Cross' claim for damages.

## THE ARBITRATOR'S DECISION

Local 195 urges three grounds in support of its contention that the arbitrator's decision was arbitrary and capricious and in manifest disregard of the law. The first ground is that the damages assessed were actually imposed for the picket line of Hotel Supply employees, and were therefore imposed for an alleged breach of an expired contract. This is essentially the same objection as is made to arbitrability of the dispute, and I reject it for the same reason. Upon the expiration of the Hotel Supply

---

**3.** Amalgamated Meat Cutters Local 195 v. Cross Bros. Meat Packers, Inc., 362 F.Supp. 127 (E.D.Pa.1973).

**4.** See note 2 in Judge Van Dusen's opinion, *supra.*

agreement the members of Local 195 in that bargaining unit were free to strike Hotel Supply and to picket its plant. But Local 195, bound to Cross by the slaughtering and boning contracts, was not free to cause a work stoppage at the Cross plant if those contracts forbade such a stoppage. The arbitrator concluded that they did.

The second ground is that the arbitrator in holding that a work stoppage took place in breach of the Cross agreements failed to recognize and differentiate between the activities of Hotel Supply employees and the activities of the Cross employees. The union argues that "[t]he employees of [Cross] refused to cross Supply's picket line, not because they were represented by Local 195, but rather because it was a legal picket line established pursuant to a legal strike." [5] But the dispute submitted to the arbitrator was not the legality of the picket line. It was rather the legality of the resultant work stoppage. We have recently pointed out that the right to recognize third-party picket lines may be bargained away, and the question whether that right was bargained away may be within an arbitration clause. *Island Creek Coal Co. v. United Mine Workers, supra,* n.5. Whether the Cross work stoppage resulted from protected activity—the refusal to cross a picket line of another union—or from activity which though otherwise protected had been bargained away, was clearly arbitrable under the language of the two Cross-Local 195 contracts which remained in force. Whether the arbitrator gave too broad or too narrow a reading to the contract provisions, or even an incorrect reading, is a matter with which we are not properly concerned. *E. g., General Drivers, Warehousemen & Helpers, Local No. 89 v. Riss & Co., Inc.,* 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 598–99, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953);

*Price v. International Brotherhood of Teamsters,* 457 F.2d 605, 611 (3d Cir. 1972). It was the arbitrator's interpretation that the parties to the slaughtering and boning contracts bargained for and agreed to, and we must enforce the award "if the interpretation can in any rational way be derived from the agreement . . . ." *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1128 (3d Cir. 1969).

The third ground urged by Local 195 is that in making the award the arbitrator completely ignored the "ally doctrine" of *N.L.R.B. v. Local 810, Steel Fabricators,* 460 F.2d 1 (2d Cir.), *cert. denied,* 409 U.S. 1041, 93 S.Ct. 527, 34 L.Ed.2d 491 (1972). The majority opinion in that case recognizes that the extension of a strike to other facilities of the same employer will be permitted where it can be said that in reality there is but one employer, even though separate corporations exist. The case has no application here. The scope of our review over N.L.R.B. unfair labor practice proceedings is considerably broader than that of our review of an arbitrator's award in an enforcement proceeding. If there is such an "ally doctrine" as was recognized in the *Steel Fabricators* case, a question which I do not consider, the doctrine at most involves protected activity which, like the right to honor third-party picket lines, can be bargained away. Whether the slaughtering and boning contracts prevented Meat Packers employees from becoming allies of the Hotel Supply employees by recognizing the latter's picket line was also an arbitrable issue. The arbitrator's rejection of the "ally doctrine" defense certainly may be derived in a rational way from the broad no-work stoppage language of the contracts. Our review should go no further.

Neither in the pleadings and briefs filed in the district court, nor in the briefs filed in this court did Local 195 contend that specific items of damage were improperly included in the arbitrator's calculation of the total award.

**5.** Appellant's Brief at 13.

Rather, the local's attack has been on the propriety of any award. I conclude that the arbitrator had jurisdiction over the dispute, and find his conclusion that a breach of contract by Local 195 caused damage to Cross was derived in a rational manner from the agreements.

Essentially, Judge Hunter looks upon the individual bargaining units as separate entities for purposes of § 301, while Judge Van Dusen would hold that a contract made by a local union on behalf of members in one bargaining unit can bind the entire local. It is unnecessary, in my view of the case, to decide the issue of the effect on the Supply unit employees of the no-work stoppage contracts in the slaughtering and boning units. Judge Van Dusen's approach suggests what could be a major enlargement of the § 301 remedy. No such enlargement is required for the affirmance of the district court order enforcing the award in this case, and I decline to participate in the difference between Judge Van Dusen and Judge Hunter on that issue.

JAMES HUNTER, III, Circuit Judge (dissenting):

Since it is my view that there was no jurisdiction to arbitrate the dispute growing out of supply workers' picketing of the Packers' facility, I would vacate the district court order enforcing the arbitrator's award.[1] I dissent from the contrary result reached by the majority opinions.

It has been reiterated in many decisions that arbitration is a matter of contract. Unless a bargaining unit has contracted for arbitration, a court has no power to require arbitration as a matter of law. *United Steelworkers of America v. Warrior Gulf & Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), *United Steelworkers of America v. America Mfg. Co.*, 363 U.S.

564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). The much repeated presumption in favor of arbitration can operate only where there first has been an affirmative grant of power to arbitrate by both the bargaining unit and the employer. As the majority opinions concede, it is for the court in the first instance to determine whether arbitration jurisdiction exists.

*See*: opinion of Judge Van Dusen at 6.

In the instant case, valid arbitration/no-work stoppage clauses appeared in both the boning and slaughtering agreements. *See*: opinion of Judge Van Dusen at 3, n.2. Since these two groups of workers had bound themselves to arbitrate disputes, the arbitrator had jurisdiction to consider their refusal to cross the supply workers' picket line. The arbitrator found that the refusal to cross the picket line violated the no-work stoppage clauses and assessed damages accordingly. If the award had stopped here, I would have had no difficulty joining in the court's affirmance. It is to that portion of the award assessing damages for the illegal supply picket line that I cannot subscribe. When the supply workers picketed the adjacent Packers' facility, their collective bargaining agreement had expired and they were bound by no arbitration clause. Absent a collective bargaining agreement and arbitration clause, I simply cannot understand how an arbitrator could get jurisdiction over any misconduct by the supply workers.

The majority opinions would support this result by focusing on the fact that all three collective bargaining units, boners, slaughterers and supply workers, were represented by the same union, Local 195 of the Amalgamated Meat Cutters & Butcher Workmen of North America. Jurisdiction, which concededly existed over the boning and slaughtering workers, is somehow spirited through the

---

1. I do not feel that this court is empowered to affirm portions of a unitary arbitration award, since our scope of review is limited. Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123 (3d Cir., 1969). A portion of the instant award *was rendered by an arbitrator without jurisdiction.* I would, therefore, vacate the entire award.

common union to the supply workers.[2] By focusing on the union without reference to the three separate units represented by the union, I think both opinions err.

It is true that for the purposes of the Labor Management Relations Act, § 301(b), 29 U.S.C. § 185(b), a union may sue and be sued in its own capacity and that damages entered against a union, either in an arbitration case or in a § 301 case, must be satisfied from union funds. The personal resources of union agents may not be attached in the § 301 context. *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 248, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962). This is not to say, however, that the union's activity can be examined without any reference to the bargaining unit it represents. § 301(b), 29 U.S.C. § 185(b), recognizes that the union acts "in *behalf* of the employees whom it represents." (Emphasis added). From this language, courts have implied a duty of fair representation which the labor organization owes to the employees for whom it acts as bargaining agent. Although the union is recognized as an entity with independent status, it is an entity which acts primarily in a representative capacity.

In the instant case I do not find it inconsistent with the union's status as an entity to say that Local 195 as the representative of the supply workers could be charged with different responsibilities than as representative of the boning and slaughtering workers. In holding otherwise, Judge Van Dusen implies that one local cannot fairly represent different bargaining units where different duties may arise from its status with respect to each unit.[3] The premise of this remarkable conclusion is that the provisions of one unit's collective bargaining agreement can bind a different group of workers who happen to be represented by the same union.[4] In my view the effect of this line of reasoning is to obliterate boundary lines between bargaining units represented by the same local without any basis in logic, precedent or policy.

In support of the finding of jurisdiction, Judge Van Dusen seems to accept

2. Judge Van Dusen's opinion addresses the same jurisdictional issues we believe are raised in the case. He finds arbitration jurisdiction because he feels that the union's attempt to maintain two separate identities in its representation of the packers and supply units is not justified on the facts of this case.

   The concurring opinion of Judge Gibbons asserts in contrast that once jurisdiction was gained over the union through the two enforceable collective bargaining agreements, the arbitrator could assess damages for all incidents of the work stoppage, whether caused by supply workers' illegal picketing or by the boning and slaughtering workers' refusal to cross the picket line.

3. Indeed, Judge Van Dusen implies that Local 195 might have violated its duty of fair representation in this case by favoring one unit as opposed to another in the drafting of a "defective" contract. *See:* opinion of Judge Van Dusen at 1115, n.13. The basis for this suggestion is that the boners' and slaughterers' contracts were ambiguous and could be interpreted to bind the supply workers.

   In order to arrive at this supposed breach of duty, one must first assume that a Local cannot act independently for two separate units of employees. I do not agree that a contract negotiated for one group of workers can be ap-

plied to another group. Since I disagree with this premise, I cannot accept that this contract was defective or ambiguous or that any possible breach of fair representation can be implied from these facts.

4. We cannot agree with Judge Van Dusen's conclusion that the restrictions he transfers from the packers' contracts to the supply workers are in any way analogous to the case of a local being bound by terms imposed by the international. *See:* opinion of Judge Van Dusen at 1118, n.11.

   Even considered in ordinary contract terms, there is privity between the supply workers and the international which would justify binding the supply workers by the international's constitution and bylaws. Quite clearly, there is no privity between the boning and slaughtering workers and the supply workers.

   The supply workers were not parties to the packers' employees' collective bargaining agreements. To imply, in Judge Van Dusen's words, that mere "forewarning of the potential limitation on their protected activities" (Opinion of Judge Van Dusen at 1119, n.11) might be sufficient to bind the supply workers is, in my view, a drastic departure from ordinary principles of contract law. I note further that no support for this view is offered in the main opinion.

the employer's theory that the union should not be allowed to "change hats" at will. *See*: opinion of Judge Van Dusen at 1118. This overly simplistic analogy once again ignores the union's representative status. With this same vision of the union as entity, the court reads an ambiguity into the slaughtering and boning agreements where fairly considered none exists. In the contracts at issue, Local 195 bound itself and its individual members not to interfere with production at the Packers' facility. This guarantee language appears in the collective bargaining agreements covering Packers' employees. Local 195 bound itself and its individual members solely in the context of this bargaining situation and within this context, "individual members" logically should refer to the boning and slaughtering employees for whom Local 195 was then acting as guarantor and representative. Furthermore, that Local 195 bound *itself* does not translate through to supply employees who played no role in the formation of the contract. I find it completely unjustified to take this guarantee language out of context and to use it as the basis for binding supply workers by the boning and slaughtering agreements.

The court seems to derive further support for its theory that the contract was ambiguous from the past strike history of the supply workers and this employer. In the past, the supply workers had not extended their picketing to related facilities of the employer, thereby leading the employer to assume, in the court's view, that such picketing would not occur. Even if the employer justifiably expected the supply workers to limit picketing to the Supply Division, this fact is utterly irrelevant to the issue of whether the arbitrator had jurisdiction to enforce that expectation in this case. Stated quite simply, the supply workers, and the union as its representative, were bound by no contract when the supply workers extended their picketing to the adjacent facilities. The expectations of the employer and the asserted ambiguities in the boning and slaughtering agreements, do not, in my view, alter that situation with respect to the supply workers.

As though to make the incursion on protected rights appear less drastic, the court emphasizes that "holding for the company does not entirely deprive the members of the Supply unit of their right to engage in protected concerted activities." Opinion of Judge Van Dusen at 1120. Supply workers can still picket the Supply Division itself. Only their picketing of the adjacent facility is penalized. Having once established the principle that workers can be judged by the collective bargaining agreements of a separate bargaining unit, after their own agreement has expired, it does little, in my view, to characterize the restriction as minor. A broad ranging principle has been stated in the court's opinion, the applicability of which is obviously not limited by the facts of this case.

The arbitrator conceded that a different result would have obtained if the supply workers had been represented by a different union. *See*: opinion of Judge Van Dusen at 1118, n.11. I find it impossible to accept that significant rights of workers should turn on the fortuitous circumstances of being represented by a particular local.

But even more disturbing in my view is the fact that in blurring the boundary lines between separate bargaining units, the court necessarily calls into question the National Labor Relations Board's process for certification of an appropriate bargaining unit. § 9(b) of the National Labor Relations Act, 29 U.S.C. § 159(b), specifically gives the National Labor Relations Board power to determine an appropriate bargaining unit "in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subsection. . . ." In the instant case, the National Labor Relations Board has certified three separate units and accepted Local 195 as the representative of each. The court nevertheless suggests that one means of avoiding recurrence of the same problem in the future might be to petition the

National Labor Relations Board for consolidation of the three bargaining units. *See*: opinion of Judge Van Dusen at 1120, n.15. To suggest that three separately certified bargaining units should be joined into one merely because of the arbitrator's implied findings in this case, is to lose sight of the relationship between the National Labor Relations Board and arbitration. In this case, the arbitrator found that Local 195 could not "change hats" from packers to supply representative, since it had bound itself in all its roles. Because of this finding the court in turn theorized a conflict of interest in one union's representation of three different bargaining units. The inescapable product of this line of reasoning is that the National Labor Relations Board erred either in certifying three bargaining units or in allowing Local 195 to represent the three. Although the Board will often defer as a matter of policy to arbitral settlement, the Supreme Court has agreed that in case of actual conflict "the superior authority of the Board" should "take precedence" over the arbitrator's ruling. *Carey v. Westinghouse Corp.*, 375 U.S. 261, 272, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), *NLRB v. Plasterers Local Union No. 79*, 404 U.S. 116, 137, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971). In my estimation, this court's insinuation of conflict between the National Labor Relations Board's certification of three separate units and the arbitrator's decision in this case is wholly unjustified. As I have already stated, I find no difficulty in accepting the fact that one union can act as the representative of three units of workers although different responsibilities arise in each context. But even if the court were correct in its assessment of a possible conflict, the cited precedents should prevent a wholesale acceptance of the arbitrator's findings when those findings seem to clash with the National Labor Relations Board's certification of three separate units under § 9(b) of the National Labor Relations Act, 29 U.S.C. § 159(b).

In my view, the union, as bargaining representative for the supply workers, could not be bound by the arbitration clauses it had negotiated as representative of the slaughtering and boning workers; the supply workers' own collective bargaining agreement with the employer had expired; and this court has power to enforce an arbitration award only where it finds that the parties by contract have agreed to arbitrate. Since no arbitration jurisdiction over the supply picket line has been shown, I would vacate the district court's order enforcing the arbitration award.

The contrary result reached by the majority is a disturbing extension of the arbitration remedy [5] to situations where there has been no clearcut grant of arbitration jurisdiction. In effect, the majority goes a long way toward eroding the sound rule that arbitration cannot be required as a matter of law. Coincident

---

5. In this Circuit, a finding of jurisdiction to arbitrate has often gone hand-in-hand with a holding that a federal court can *enjoin* a particular work stoppage pending arbitration. Island Creek Coal Co. v. United Mine Workers, 507 F.2d 650 (3d Cir., 1975), NAPA Pittsburgh, Inc. v. Automotive Chauffeurs Local 926, 502 F.2d 321 (3d Cir., 1974). I have expressed my disagreement with this tendency to equate arbitrability with enjoinability. *See:* my dissenting opinion in *NAPA*, 502 F.2d at 324 and Judge Adams' dissenting opinion in *Island Creek*, 507 F.2d at 654. Although injunctions are not an issue in this case, the majority's finding of arbitrability would probably be sufficient under *NAPA* and *Island Creek* to support an injunction of the supply workers' picket line.

Under *NAPA*, there was at least *some* restraint on a federal court's power to enjoin a work stoppage since a valid grant of arbitration jurisdiction was a prerequisite to any injunction. But if arbitration jurisdiction is found to exist as here where there is *no* arbitration clause either operative or in effect, even this limited restraint on a federal court's power to enjoin work stoppages disappears. The predicted effect of the majority opinions will be the effective repeal in this Circuit of the no-injunction rule of § 4 of the Norris-La-Guardia Act, 29 U.S.C. § 104. I must voice my complete disagreement.

with the extension of arbitration is a move to penalize and restrict employees in the exercise of activities, including picketing, which have traditionally served as tools of striking workers. In so elevating the arbitration remedy, I think the majority opinions go far astray.