ALYESKA PIPELINE SERVICE
COMPANY, Plaintiff-Appellee,

v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WARE-
HOUSEMEN AND HELPERS OF
AMERICA, and its General Teamsters
Local 959, State of Alaska, Defendants-
Appellants.

No. 76–2896.

United States Court of Appeals,
Ninth Circuit.

April 1, 1977.

Rehearing Denied July 21, 1977.

See also 9 Cir., 535 F.2d 1144.

Fredric R. Dichter, Birch, Jermain, Horton & Bittner, Anchorage, Alaska, argued, for defendants-appellants.

Kenneth P. Eggers, Groh, Benkert & Walter, Anchorage, Alaska, Charles P. O'Connor, William J. Curtin, Washington, D. C., argued, for plaintiff-appellee.

Before HUFSTEDLER and TRASK, Circuit Judges, and BURNS,* District Judge.

BURNS, District Judge:

Defendant-union appeals the issuance of a permanent injunction by the district court. The injunction enforced an arbitrator's award which prohibited pipeline project picketing in Alaska.

Jurisdiction of the district court was based on Section 301 of the Labor Management Relations Act of 1947, as amended (29 U.S.C. § 185). Our jurisdiction is based on 28 U.S.C. § 1291.

## FACTS

Alyeska Pipeline Service Company (Alyeska), a consortium of eight oil companies, is the contractor responsible for building the Alaska pipeline project. Alyeska entered into a comprehensive collective bargaining agreement with the International Brotherhood of Teamsters, a number of other international unions covering work and occupations relevant to the project, and the local unions affiliated with those organizations having geographical jurisdiction over the Trans-Alaska Pipeline System (TAPS) Project. Appellant, Local 959 of the Teamsters' Union (Local 959), is one of the signatory affiliated local unions. This agreement, entitled the Trans-Alaska Pipeline System Project Agreement (TAPS Agreement), became effective on April 29, 1974. After this date, the employees of Chicago Bridge and Iron (CBI) elected Local 959 as their bargaining agent.

An important component of the pipeline project is a terminal storage and tanker loading facility being constructed near Valdez, Alaska, to receive and transfer the oil arriving through the pipeline. Four thousand construction workers are employed at the 700 acre Valdez construction site.

On August 4, 1976, Local 959 set up a picket line on the Dayville Road, the only road leading to the Valdez terminal site. The picket line was first established at a point ten miles from the terminal site. Two days later it was moved to the main gate. The picketing resulted from a dispute over the assignment of certain "back-

* Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation.

haul" work between Local 959 and CBI, a subcontractor performing construction services at the Valdez site. During the course of the picketing, virtually all common carrier service to and from the Valdez site was stopped.

Alyeska filed a complaint in the district court seeking injunctive relief and damages for the breach of the TAPS Agreement's no-strike provision.[1] Application was made for a temporary restraining order and a preliminary injunction. On August 6, 1976, the district court (Chief Judge von der Heydt) issued a temporary restraining order prohibiting picketing at the terminal site.

On August 11, 1976, Judge von der Heydt denied Alyeska's motion for a preliminary injunction and vacated the temporary restraining order. Judge von der Heydt determined that the dispute underlying the picketing was not subject to the compulsory arbitration clause of the TAPS Agreement. Relying on *Buffalo Forge Co. v. United Steel Workers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), he therefore concluded that the general no-strike provisions of Article VII of the TAPS Agreement could not form the basis for a Boys Markets[2] injunction.

Alyeska then instituted arbitration proceedings against Local 959 as authorized by Section 4 of Article VII of the TAPS Agreement for violation of the general no-strike provisions. Section 4 directs that the arbitrator shall hold a hearing within 24 hours of notification, the sole issue at the hearing is to be whether a violation of the no-strike provisions has occurred. Section 4 further provides that the arbitrator shall have no authority to consider any factor in justification, explanation, or mitigation of the alleged violation. The arbitrator's award may be enforced by any court of competent jurisdiction, and rights inconsistent with this procedure are waived by the parties.

The arbitrator heard Alyeska's complaint on August 13, 1976. At the conclusion of the hearing, the arbitrator found "that picketing has taken place at the site, that the picketing was sanctioned under the auspices of the Union, and that the effect was to shut off normal ingress and egress of supplies and materials to the project, and is therefore a disruptive activity within the meaning of Article VII of the Agreement." The arbitrator specifically rejected Local 959's claim that the picketing activity was exempt from the TAPS Agreement because it concerned a primary dispute between the union and CBI. He found that Article VII, Sections 1 and 3, of the TAPS Agreement prohibits all picketing at the project site. The arbitrator then ordered the union to stop picketing at the project site which included the Valdez terminal and Dayville Road the sole access road.

Alyeska then returned to district court (Judge Fitzgerald) where it obtained a tem-

---

1. Sections 1, 2 and 3, of Article VII of the TAPS Agreement provided as follows:

    "1. During the term of this Project Agreement, there shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union or by any employee, and there shall be no lockout by the Contractor.

    "2. Failure of any Union or employee to cross any picket line established at the Project site is a violation of this Article.

    "3. The Union shall not sanction, aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity at the Project site and shall undertake all possible means to prevent or to terminate any such activity. No employee shall engage in activities which violate this Article. Any employee who participates in or encourages any activities which interfere with the nor-

    mal operation of the Project shall be subject to disciplinary action, including discharge. The Union shall not be liable for acts of employees for which it has no responsibility. The International Union General President or Presidents will immediately instruct, order and use the best efforts of his office to cause the Local Union or Unions to cease any violation of this Article. An International Union complying with this obligation shall not be liable for unauthorized acts of its Local Union. The failure of the Contractor to exercise its rights in any instance shall not be deemed a waiver of its rights in any other instance."

2. *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

porary restraining order enforcing the arbitrator's award. On August 18, 1976, Judge Fitzgerald granted Alyeska's motion for a preliminary injunction, and the corresponding permanent injunction was issued August 19, 1976, from which this appeal is prosecuted.

## DISCUSSION

### I.

■ Judge von der Heydt, in the first district court proceeding, found that the dispute giving rise to the picketing was outside the scope of the TAPS Agreement. He, therefore, refused to grant injunctive relief in support of the no-strike provisions of Article VII because the underlying dispute was not arguably arbitrable. Appellant Local 959 contends this ruling denied the arbitrator jurisdiction to determine whether or not the picketing activity *itself* violated the TAPS Agreement.

■ Alyeska's motion, which Judge von der Heydt denied, sought to enjoin the picketing activity until the anticipated arbitration proceedings were completed. *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) provides the principal authority for issuing such an injunction. However, the Boys Markets injunction was properly denied because the court determined that the parties were not contractually bound to arbitrate the grievance giving rise to the picketing. *Boys Markets, Inc. v. Retail Clerks Union, Id.* at 254, 90 S.Ct. 1583.

Judge von der Heydt did not decide the issue of whether the picketing *itself* violated the no-strike provisions of the TAPS Agreement. Even if the picketing were a violation of the TAPS Agreement, and if it were within the scope of a binding arbitration clause, the court would be without power to issue an injunction pending the arbitrator's decision because *the dispute giving rise to the picketing* is not subject to binding arbitration. *Buffalo Forge Co. v. United Steelworkers of America, supra.* The propriety of the union's picket was an issue reserved for the arbitrator.

### II.

The appellant next asserts that the arbitrator is without authority or jurisdiction to determine the validity of the picketing activity because the dispute which resulted in the picketing is outside the scope of the TAPS Agreement.

■ Authority or jurisdiction to arbitrate a grievance "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of America v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960).

■ Clearly, the language of Article VII, Section 1, is susceptible of an interpretation that covers the disputed picketing. "[T]here shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union or by any employe . . . ."

Article III of the TAPS Agreement[3] excludes the Chicago Bridge and Iron-Local 959 dispute from the TAPS Agreement because "backhaul" work is not "new construction work." However, this does not eliminate the jurisdiction of the arbitrator in this case. The TAPS Agreement is susceptible of an interpretation that its scope, and the concomitant arbitrator's jurisdiction, does include picketing which directly *impacts* upon those activities enumerated in Article III. This conclusion is not altered

---

**3.** Article III, Section 1, of the TAPS Agreement provides in part as follows:

"1. This Agreement shall apply to the new construction work performed by the Contractor, which construction work generally is described as (a) a crude oil mainline pipeline from the origin pump station to be located near Prudhoe Bay and terminating at Valdez, Alaska; . . . [and] (e) a marine terminal and related facilities including oil storage, tanker loading facilities and an operations control center at Valdez.

by the fact that the subject of the dispute giving rise to the picketing is outside the TAPS Agreement's reach.

### III.

Local 959 further contends it should not be bound by the TAPS Agreement when representing the employees of CBI because Local 959 did not represent these employees at the time it signed the agreement.

The TAPS Agreement, which was signed by numerous unions, and which was binding on all "contractors and subcontractors of whatever tier," should be given broad application. The TAPS Project was undertaken to meet an impending national energy crisis. The enormous construction effort required to build the pipeline is made even more arduous by the severe climatic conditions of Alaska. Given the national importance of the project and the difficulties of construction, work stoppages brought about by labor disputes are to be avoided.

If the TAPS Agreement does not apply to the employees of CBI, then the worthwhile goal of industrial peace on the Alaska pipeline project will be severely frustrated. Alyeska would be without power to form an agreement, prior to construction, which would assure labor-management harmony on this project of immediate national urgency. Necessarily, when Alyeska and the large number of unions signed the TAPS Agreement, certain units of employees had not yet been formed and had not yet elected their bargaining representatives. To assure the orderly and timely completion of the pipeline, the TAPS Agreement must apply to these units of employees.

In the present case, Local 959 did not bargain away rights of one unit when it represented another. It simply agreed not to disrupt work at the project site and to submit any work disruption issues to binding arbitration. The employees of CBI could have elected a union which had not signed the TAPS Agreement (if one existed). By electing Local 959, these employees gained the strengths and talents of this particular union. They also assumed its inherent liabilities including the agreement not to disrupt work at the project site.

A similar case, *Amalgamated Meat Cutters and Butcher Workmen of North America v. Cross Brothers Meat Packers, Inc.*, 518 F.2d 1113 (3d Cir. 1975), holds that employees' right to picket is an arbitrable issue where the collective bargaining agreement has expired and where the local union which represents them has no-strike and arbitration agreements with the common employer covering different bargaining units. This holding, which is opposed to Local 959's position, is grounded both on the particular agreement between the parties, and the court's limited role in reviewing an arbitrator's award.

As we have emphasized before, this court's function in reviewing an arbitrator's decision is limited, indeed:

> "[i]t is not the function of the courts to review the merits of arbitration awards. The interpretation of a collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction that was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him, because their interpretation of the contract is different than his. An award is legitimate if it draws its essence from the agreement and only when the arbitrator's words manifest an infidelity to this obligation may the courts refuse enforcement of the award." *San Francisco-Oakland Newspaper Guild v. Tribune Publishing Co.*, 407 F.2d 1327, 1327 (9th Cir. 1969).

Given the probable correctness of the arbitrator's decision that the TAPS Agreement applied to the employees of CBI, and given this court's limited scope of review, Local 959 must fail in its assertion. It can not be said that the arbitrator showed infidelity to the TAPS Agreement when he found that it bound these employees in this situation.

■ Appellant also asserts that the arbitrator was without authority to determine that picketing on the Dayville Road at a point ten miles from the Valdez construction site constituted picketing at the "project site." [4]

The TAPS Agreement is susceptible of an interpretation that the arbitrator had the power to determine that the Dayville Road fell within the scope of the term "project site" as used in the agreement. *United Steelworkers of America v. Warrior and Gulf Navigation Co., supra.* In order to perform his function, the arbitrator must have the power to determine the extent of the "project site" since only picketing at such a location is proscribed.[5]

Nor can it be said that the arbitrator manifested an infidelity to the TAPS Agreement when he determined that the term "project site" included a location on the Dayville Road at which picketing affected access to the Valdez site. *San Francisco-Oakland Newspaper Guild v. Tribune Publishing Co., supra.*

The judgment of the district court is affirmed.

---

**4.** Of course, after the first two days, the picketing was actually carried on immediately outside the gates of the Valdez site.

